

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP RULE 77(d)

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ICU MEDICAL, INC., | CASE NO. SA CV 04-00689 MRP (VBKx) |
| Plaintiff, | **ORDER GRANTING IN PART DEFENDANT ALARIS' MOTION FOR FEES, COSTS AND EXPENSES UNDER 35 U.S.C. § 285 AND GRANTING DEFENDANT ALARIS' MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11** |
| v. | |
| ALARIS MEDICAL SYSTEMS, INC., | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

## I.

## INTRODUCTION

On January 22, 2007, this Court granted defendant Alaris Medical Systems, Inc.'s ("Alaris") motion for summary judgment of invalidity of plaintiff ICU Medical, Inc.'s ("ICU") "spikeless" claims, thereby dismissing ICU's remaining claims in this case. As the prevailing party, Alaris now seeks to recover fees, costs and expenses under 35 U.S.C. § 285, 28 U.S.C. § 1927 and the Court's inherent power. (*See* Alaris' Mem. in Supp. of its Mot. for Fees, Costs and Expenses under 35 U.S.C. § 285, 28 U.S.C. § 1927 and the Court's Inherent Power, filed Mar. 1,

730

1   2007 (the "Fees Motion").) Alaris has also renewed a prior motion for sanctions against ICU

2   under Federal Rule of Civil Procedure 11. (*See* Alaris' Mem. of P. &. A. in Supp. of Alaris'

3   Mot. for Sanctions Pursuant to Fed. R. Civ. P. 11, filed Sep. 19, 2005 and renewed on Feb. 26,

4   2007 (the "Rule 11 Motion").) On March 29, 2007, the Court heard oral argument from the

5   parties with respect to these motions and took them under submission.

6       The Court finds that this case is exceptional within the meaning of Section 285 and

7   awards Alaris a portion of its requested attorney fees on that basis. The Court finds that

8   sanctions are also warranted under Rule 11 for ICU's assertion of the "spike" claims in its

9   amended complaint, but finds that such sanctions are subsumed by the Court's award of attorney

10   fees under Section 285. Further sanctions are otherwise inappropriate or unnecessary under

11   Section 1927 or the Court's inherent power.

12

13                                   **II.**

14                               **DISCUSSION**

15       The factual and procedural background of this case has been documented in the Court's

16   prior orders and need not be repeated here.[1] ICU's case has concluded by the Court's grant of

17   Alaris' request for summary judgment of noninfringement of ICU's "spike" claims in U.S.

18   Patent Nos. 5,685,866 ("the '866 Patent"), 5,873,862 ("the '862 Patent") and 6,572,592 ("the

19   '592 Patent"), as well as Alaris' request for summary judgment of invalidity of ICU's

20

21

22

_____

[1] The factual and procedural background can be found in the following Court documents:
   1) July 30, 2004 Order Denying Plaintiff's Motion for a Preliminary Injunction and Findings of Fact and Conclusions of Law ("TRO/PI Denial Findings/Conclusions");
   2) July 17, 2006 Claim Construction Order (the "CC Order");
   3) July 17, 2006 Partial Summary Judgment Order for Noninfringement of "Spike" Claims and August 25, 2006 Findings of Fact Not Genuinely Contested and Conclusions of Law (collectively, "Spike PSJ Findings/Conclusions");
   4) Jan. 22, 2007 Order Granting Defendant Alaris' Motion for Summary Judgment of Invalidity of Plaintiff ICU's "Spikeless" Claims under 35 U.S.C. § 112 (the "Spikeless SJ Order"); and
   5) Feb. 21, 2007 Findings of Fact Not Genuinely Contested and Conclusions of Law in Support of the Court's 1/22/2007 Order Granting Alaris' Motion for Summary Judgment of Invalidity of "Spikeless" Claims under 35 U.S.C. § 112, ¶¶ 1 & 2 ("Spikeless SJ Findings/Conclusions").

1   "spikeless" claims in U.S. Patent No. 6,682,509 ("the '509 Patent") and the '592 Patent.[2]

2   Having prevailed in the case, Alaris now seeks its fees, costs and expenses under Section 285,

3   Section 1927 and the Court's inherent power for this nearly three-year long litigation. Alaris has

4   also renewed a prior motion for Rule 11 sanctions targeting ICU's assertion of the "spike" claims

5   in the '866, '862 and '592 Patents in ICU's amended complaint.

6

7   **A.      Legal Standards**

8          1.      Attorney Fees Under 35 U.S.C. § 285

9          Section 285 of the Patent Act authorizes the court to award "reasonable attorney fees to

10  the prevailing party" in "exceptional cases." 35 U.S.C. § 285. Such fees are awarded when: 1) a

11  court finds that there is clear and convincing evidence that the case is exceptional; and 2) the

12  court then exercises its discretion to award fees to the prevailing party. *Superior Fireplace Co.*

13  *v. Majestic Prods. Co.*, 270 F.3d 1358, 1376 (Fed. Cir. 2001); *Sensonics, Inc. v. Aerosonic Corp.*,

14  81 F.3d 1566, 1574 (Fed. Cir. 1996). The purpose of such an award is to rectify, at least in part,

15  the injustice done to the defendant caused by litigation brought in bad faith; this serves to defend

16  the court and the judicial system against abuse. *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir.

17  1988).

18         An exceptional case occurs "when there has been some material inappropriate conduct

19  related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in

20  procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct

21  that violates Fed. R. Civ. P. 11, or like infractions." *Brooks Furniture Mfg., Inc. v. Dutailier*

22  *Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). However, "[a]bsent misconduct in conduct of

23  the litigation or in securing the patent, sanctions may be imposed against the patentee only if

24  both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively

25  baseless." *Id.* (citing *Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.*, 508 U.S. 49,

26

27

28  [2] The Court uses the terms "spike" and "spikeless" here to describe and differentiate the needleless medical valve claims and embodiments in ICU's asserted patents that expressly recite a "spike" element from those that do not. The term "spikeless," in particular, is not a term of art and does not appear in the patents-in-suit.

1   60-61 (1993) (defining "sham" litigation under antitrust law)).  The Federal Circuit has

2   elaborated that when "the patentee is manifestly unreasonable in assessing infringement, while

3   continuing to assert infringement in court, an inference is proper of bad faith, whether grounded

4   in or denominated wrongful intent, recklessness, or gross negligence." *Eltech Sys. Corp. v. PPG*

5   *Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990).  Thus, the "filing and maintaining of an

6   infringement suit which the patentee knows, or on reasonable investigation should know, is

7   baseless constitutes grounds for declaring a case exceptional under 35 U.S.C. § 285." *Id.* at 810

8   (quotation omitted).[3]  Similarly, "[l]itigation misconduct and unprofessional behavior are

9   relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285,"

10  as may the assertion of a frivolous claim interpretation or the vexatious raising, litigating and

11  later dropping of claims or defenses, even when an honest mistake is alleged. *Sensonics*, 81 F.3d

12  at 1574; *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1243 (Fed. Cir.

13  1984); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 (Fed. Cir. 1989).

14  The Federal Circuit has also cautioned that "[a]lthough the trial judge may exercise his discretion

15  to award attorney fees and costs because of inequitable conduct during prosecution of the patent

16

17

---

[3] ICU advocates that, under *Brooks*, a finding of exceptionality based on a party's bad faith engagement in objectively baseless litigation requires direct proof of that party's subjective intent to engage in that litigation.  ICU is only partially correct, as such potent proof would be sufficient, but not necessary in showing bad faith.  Prior Federal Circuit authority, particularly under *Eltech*, stated that subjective bad faith could be: 1) "grounded in or denominated wrongful intent, recklessness, or gross negligence;" or 2) derived from a party's decision to engage in a litigation tactic that "the patentee knows, or on reasonable investigation should know, is baseless." 903 F.2d at 810-11.  While the *Eltech* court required more than mere negligence to show bad faith, it also held that a party's knowledge of its litigation tactics' baseless nature could be inferred objectively from the circumstances surrounding those tactics.  *Id.* at 810.  This objective showing of a party's subjective knowledge, and thus its bad faith, alleviated the "difficulty of proving what is in an adversary's mind" by granting the aggrieved party "liberty to prove facts establishing that that adversary should have known, i.e. to prove facts that render the 'I didn't know' excuse unacceptable." *Id.*

     *Eltech's* objective articulation of what constitutes bad faith engagement in objectively baseless litigation, otherwise termed vexatious, frivolous or unjustified under the *Brooks* standard, is consistent with authority cited by the *Brooks* case, which cited to, and relied on, the *Eltech* standard.  *See, e.g., Brooks*, 393 F.3d at 1381 (citing *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329-31 (Fed. Cir. 2003) (holding that in evaluating bad faith vexatious, unjustified or frivolous litigation under Section 285, "the pertinent inquiry is thus whether [one party] knew or should have known that it would be estopped from asserting [its] . . . patents against [the other party], but pursued its infringement counterclaim anyway." (citing *Eltech*, 903 F.2d at 810-11))).  Thus, the *Brooks* panel did not overrule or substantively narrow the bad faith standard advanced by *Eltech*.  *See also Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed. Cir. 2003) (citing the *Eltech* standard); *Haynes Int'l Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed. Cir. 1993) (same); *see also South Corp. v. United States*, 690 F.2d 1368, 1370 n.2 (Fed. Cir. 1982) (*en banc*) (holding that only an *en banc* court can overrule earlier panel decisions).

1    or misconduct during litigation, attorney fees are not to be routinely assessed against a losing

2    party in litigation[,] in order to avoid penalizing a party for merely defending or prosecuting a

3    lawsuit." *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1372 (Fed. Cir. 2003) (citation

4    and quotation marks omitted).  Finally, in assessing whether a case qualifies as exceptional, "the

5    district court must look at the totality of the circumstances." *Yamanouchi Pharm. Co., Ltd. v.*

6    *Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346-47 (Fed. Cir. 2000).

7          Once the court finds a case exceptional, it may award fees based on "the relevant

8    considerations, such as the closeness of the case, the tactics of counsel, the flagrant or good faith

9    character of the parties' conduct, and any other factors contributing to imposition of punitive

10   sanctions or to fair allocation of the burdens of litigation." *Perricone v. Medicis Pharm. Corp.*,

11   432 F.3d 1368, 1380-81 (Fed. Cir. 2005).  "The court's choice of discretionary ruling should be

12   in furtherance of the policies of the laws that are being enforced, as informed by the court's

13   familiarity with the matter in litigation and the interest of justice." *S.C. Johnson & Son, Inc. v.*

14   *Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986) (citation omitted).  In exceptional

15   cases, the aggrieved party is entitled to an award of "the portion of its attorney fees which related

16   to the vexatious litigation strategy and other misconduct." *Beckman*, 892 F.2d at 1553.  "The

17   determination of the amount of the award remains within the discretion of the trial court, since it

18   is the trial judge who is in the best position to know how severely [the offending party's]

19   misconduct has affected the litigation." *Id.*  Thus, where litigation misconduct forms the basis

20   for finding that the case is exceptional under Section 285, the record must establish a causal

21   nexus between the fees claimed and the misconduct.  *Id.*

22

23          2.    Sanctions Under Federal Rule of Civil Procedure 11

24          Federal Rule of Civil Procedure 11 permits sanctions for filings, such as pleadings,

25   motions or other "paper[s]," where: 1) such papers are legally or factually baseless from an

26   objective perspective; and 2) the asserting party cannot show that it conducted a reasonable and

27   competent inquiry before signing and filing the document.  Fed. R. Civ. P. 11; *Christian v.*

28   *Mattel*, 286 F.3d 1118, 1127 (9th Cir. 2002); *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208

1    F.3d 981, 985-96 (Fed. Cir. 2000). A claim is legally baseless if it is legally unreasonable, while

2    a claim is factually baseless if it lacks factual foundation. *Estate of Blue v. County of Los*

3    *Angeles*, 120 F.3d 982, 985 (9th Cir. 1997). The party asserting the claim bears the burden of

4    showing that its inquiry was reasonable and competent. *View Eng'g*, 208 F.3d at 986. Rule 11

5    sanctions are designed to "reduce frivolous claims, defenses or motions and to deter costly

6    meritless maneuvers, thereby avoiding delay and unnecessary expense in litigation." *Christian*,

7    286 F.3d at 1127 (citation and quotation marks omitted). Rule 11 sanctions are thus limited "to

8    what is sufficient to deter repetition of such conduct or comparable conduct by others similarly

9    situated." Fed. R. Civ. P. 11(c)(2).

10        Unlike sanctions under Section 285, Section 1927 or the Court's inherent power, which

11   may be based on attorney misconduct, Rule 11 sanctions are only available with regard to signed

12   papers filed with the court. *United Energy Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.*,

13   837 F.2d 356, 364-65 (9th Cir. 1988). Rule 11 sanctions for a patent infringement claim would

14   be appropriate if it is legally unreasonable or without factual foundation such that an objectively

15   reasonable attorney would not believe that every claim limitation reads on the accused products

16   either literally or under the doctrine of equivalents. *View Eng'g*, 208 F.3d at 986.

17

18        3.    Sanctions Under 28 U.S.C. § 1927

19        Section 1927 under Title 28 of the United States Code, entitled "Counsel's liability for

20   excessive costs," provides: "Any attorney . . . who so multiplies the proceedings in any case

21   unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

22   expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

23   An award of sanctions under Section 1927 must be supported by a finding of subjective bad faith

24   for "unnecessary filings and tactics once a lawsuit has begun." *Trulis v. Barton*, 107 F.3d 685,

25   694 (9th Cir. 1995) (citation omitted); *In re Keegan Mgmt. Co. Secs. Litig.*, 78 F.3d 431, 435

26   (9th Cir. 1996). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous

27   argument or argues a meritorious claim for the purpose of harassing an opponent." *Trulis*, 107

28   F.3d at 694 (citation and quotation marks omitted). Unlike sanctions under Rule 11, sanctions

1    under Section 1927 do not require that a filing be entirely frivolous, so long as a finding of bad

2    faith intention to harass or recklessness is made. *In re Keegan Mgmt. Co.*, 78 F.3d at 436.

3

4        4.    Sanctions Under the Court's Inherent Power

5        Alaris also seeks an award of fees and costs under the Court's inherent power to sanction

6    the prosecution of bad faith litigation and litigation misconduct. "The inherent power

7    encompasses the power to sanction attorney or party misconduct," and includes the power to

8    assess fees and costs "when a party has acted in bad faith, vexatiously, wantonly, or for

9    oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (citation omitted).

10   The Ninth Circuit specifically requires a finding of bad faith in order for a court to grant

11   sanctions under its inherent power. *In re Keegan Mgmt. Co.*, 78 F.3d at 436 (citations omitted).

12   While the Supreme Court has advised that the sanctioning scheme found in various statutes and

13   rules has not displaced the courts' inherent power, "when there is bad-faith conduct in the course

14   of litigation that could be adequately sanctioned under [a statute or] the Rules, the court

15   ordinarily should rely on the [statute or] Rules rather than the inherent power." *Chambers*, 501

16   U.S. at 46, 50.

17

18   **B.    Analysis Under 35 U.S.C. § 285**

19        1.    Alaris is the Prevailing Party

20        Determination of the prevailing party is based on the relation of the litigation result to the

21   overall objective of the litigation, and not on a count of the number of claims and defenses.

22   *Brooks*, 393 F.3d at 1381 (citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S.

23   782, 789 (1989) ("plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if

24   they succeed on any significant issue in litigation which achieves some of the benefit the parties

25   sought in bringing the suit") (citation and quotation marks omitted)).  ICU accused Alaris of

26   infringing four of its patents and demanded that Alaris cease producing the accused SmartSite

27   products.  When Alaris established its non-infringement of ICU's "spike" claims and the

28   invalidity of ICU's "spikeless" claims, it prevailed in the litigation.

2.     This Case is Exceptional

The Court finds that this case is exceptional by the clear and convincing evidence that Alaris has provided. This evidence shows that ICU engaged in improper litigation when it sought the temporary restraining order and preliminary injunction (the "TRO/PI") and when it later asserted the "spike" claims in an amended complaint after the TRO/PI was denied. Both the TRO/PI request and the amended complaint's assertion of the "spike" claims were objectively baseless and brought in bad faith, making this case an exceptional one. The Court addresses each in turn.

> a)     *ICU's Request for a Temporary Restraining Order and Preliminary Injunction in June 2004*

The facts surrounding ICU's request for the TRO/PI are sufficient by themselves to make this case exceptional. ICU filed this lawsuit on June 16, 2004, asserting only the '509 Patent and its "spikeless" claims, claims 17-23, which ICU states were drafted and prosecuted specifically to combat Alaris' SmartSite Valve. Upon the filing of this lawsuit, ICU also filed an *ex parte* application for a temporary restraining order and order to show cause why Alaris should not be preliminarily enjoined from making, using and selling SmartSite Valves (the TRO/PI). The Court denied ICU's request for the TRO/PI in July 2004, however, ICU engaged in several improper litigation tactics at the beginning of the case.

First, ICU asserted only facially invalid claims in the '509 Patent in requesting the TRO/PI, all the while maintaining that it was diligent and pursuing valid claims before the Court. Approximately 22 of the '509 Patent's total 29 claims were identical to claims in the '592 Patent, while six of the seven asserted '509 Patent claims (claims 17-22) were identical to '592 Patent claims (claims 35-39 and 46), and the remaining claim, claim 23, suffered from an improper claim of dependency on claim 22.

These were flaws that even a cursory review of the asserted patent's prosecution history would have revealed. The prosecution histories of the '509 and '592 Patents are interrelated, as ICU applied for the '509 Patent during the prosecution of the '592 Patent. ICU filed the

-8-

1   application for the '592 Patent on May 9, 2000.  On November 19, 2001, ICU presented twenty-

2   nine more or less identical claims to the Patent and Trademark Office ("PTO") twice: 1) in an

3   amendment to ICU's then-pending application that ultimately became the '592 Patent; and 2) in

4   ICU's new continuation application for the '509 Patent.  The '509 Patent was thus a "child" of

5   the '592 Patent; it derived from the '592 Patent application and included virtually the same

6   "spikeless" claims.  The '592 Patent issued on June 3, 2003, while the '509 Patent issued on

7   January 27, 2004.  One of the prosecuting attorneys for the '592 and '509 Patents stated that he

8   believed his firm filed the duplicate claims to "get the claims allowed more quickly," but this

9   race between the patents was not disclosed to the PTO.  (*See* Alaris Fees Mot. Reply Br. at 5.)

10  After the '509 Patent issued, ICU requested that the PTO correct, among other things, two

11  articles in each of asserted claims 17 and 20 ("an" to "a" and "a" to "an"), and remove a "g"

12  from "snuggly," to read "snugly," in claims 20-22.  The double-patenting, however, was not

13  discovered or noted by the PTO.  The requested Certificate of Correction issued on June 15,

14  2004.  ICU filed this suit the following day, asserting only the '509 Patent, and requested the

15  TRO/PI two days after that.  At that time, the corresponding claims of the '592 Patent contained

16  five of the seven errors that were corrected in the asserted claims of the '509 Patent.

17       ICU was at best grossly negligent in failing to detect the presence of the double-patented

18  claims in the '509 Patent before asserting them in the complaint and before claiming diligence

19  before the Court in requesting the TRO/PI.  This is especially true given that the '509 and '592

20  Patents are both ICU patents, derive from the same 1992 application, share a Common

21  Specification, have the same inventor and were prosecuted by the same patent lawyers for ICU

22  only three years before in the same November 2001 filing.  Standing alone, these facts arguably

23  could be taken to indicate that ICU did not perform any reasonable investigation of the asserted

24  patents and their relatedness before initiating the litigation, despite having months, if not years to

25  do so.  In this regard, ICU claims that it missed the double-patenting because it was focused

26  instead on the obviousness objections raised by the PTO Examiner, who also failed to note the

27  double-patented claims.  But the facts show that ICU was decidedly aware of the '592 Patent's

28  existence, having attached the cover page from the '592 Patent, but not the claims, in their

TRO/PI material supporting the "indicia of validity" for the '509 Patent. Furthermore, ICU must have been acutely aware of the interrelatedness of the two patents given the fact that ICU had been working specifically on the '509 Patent in securing a Certification of Correction from the PTO immediately prior to filing this suit, one of whose corrections tied the '509 Patent's prosecution history to the '592 Patent and the November 2001 filing. Finally, ICU's litigation counsel had, by that time, worked with other ICU patents that also included the '592 Patent in their prosecution histories in earlier litigation. That ICU was unable to detect these obvious flaws in its asserted patent for several months before and after the commencement of the litigation shows not mere negligence, but gross negligence or studied ignorance, neither of which justifies placing the burden on Alaris. ICU's self-serving protests that they "didn't know" of the double-patenting and simply overlooked the "red flags" just discussed are wholly unconvincing. Further, Alaris need not show what was in ICU's "mind" in overlooking these errors, and is at "liberty to prove facts establishing that [ICU] should have known, i.e. to prove facts that render the 'I didn't know' excuse unacceptable." *Eltech*, 903 F.2d at 810.

However, ICU compounded this egregious "oversight" by failing to acknowledge or correct these claims' deficiencies or to withdraw them in an expeditious manner, despite being told of the double-patenting by Alaris and the Court. For example, Alaris first pointed out the double-patenting in the '509 claims to ICU before the hearing on the TRO/PI. As early as July 2004, Alaris outlined citations to the text of the duplicate claims, but ICU disregarded this warning from its adversary and later erroneously asserted the validity of those claims in the preliminary injunction hearing. Later, the Court cited the double-patented claims in the '509 Patent as one of the main reasons it denied the TRO/PI. Rather than correct the error after these two warnings, ICU kept four of the claims from the TRO/PI hearing in the case and then added more double-patented claims from '509 Patent (claims 1-10) that were also found in the '592 Patent (claims 17-26). ICU did not publicly acknowledge the double-patenting of those claims until over a year later. ICU now tries to excuse this delay by terming the double-patenting euphemistically as an "insurmountable problem" and stating that it took the best course of action it could by ceasing to actively assert those claims in the case, despite failing to actually drop

-10-

1    them. This response, too, was vexatious, as Alaris still had to contend with the real possibility of

2    being forced to continue to litigate these invalid claims. Thus, ICU's added recalcitrance in the

3    face of having made an arguably inexcusable error portends bad faith.

4         Second, ICU misleadingly portrayed its diligence by selectively asserting the '509 Patent

5    instead of the '592 Patent, which had issued nearly a year before ICU requested the TRO/PI. It

6    is important to note that when ICU requested the TRO/PI, Alaris' SmartSite Valve had already

7    been on the market since 1996. However, because, in ICU's view, the '509 Patent represented

8    the best arrow in ICU's quiver to combat Alaris' SmartSite Valve, ICU represented to the Court

9    that Federal Circuit authority required that ICU wait until the Certificate of Correction issued on

10   the '509 Patent in June 2006 before it could file this suit. The fact that ICU prosecuted a patent

11   to combat a competitor's product and then sued on that patent is not noteworthy[4], but ICU was

12   disingenuous in claiming that it acted diligently in asserting the '509 Patent instead of the '592

13   Patent or that it was somehow precluded from asserting the earlier '592 Patent by Federal Circuit

14   authority. ICU's claim that the '509 Patent's Certificate of Correction had "very serious

15   corrections," including changing the history of the '509 Patent to be a continuation-in-part

16   application and providing a proper antecedent basis for claim 1, is doubtful, if not wholly

17   unavailing. Again, a review of the '592 Patent would have shown that it contained virtually

18   identical claims to the ones ICU was asserting in the '509 Patent, meaning ICU could have

19   asserted its rights with a different patent nearly a year earlier. This is precisely what ICU

20   ultimately did when it later amended its complaint to include the '592 Patent's nearly identical

21   "spikeless" claims – in their uncorrected form – after the Court denied ICU's request for the

22   TRO/PI. Under those facts, ICU's excuse that the Certificate of Correction was needed and that

23   Federal Circuit authority precluded its filing earlier was entirely invalid. ICU was not diligent in

24   asserting the '509 Patent and ICU's attempt to conceal its lack of diligence by asserting the '509

25

26   _____

     [4] *See Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) ("[T]here is nothing
     improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known
27   competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a
     competitor's product the applicant's attorney has learned about during the prosecution of a patent application. Any
28   such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in
     the marketplace is simply irrelevant and cannot of itself evidence deceitful intent.").

1   Patent instead of the '592 Patent demonstrated bad faith.

2        Third, when Alaris challenged the presumption of validity of ICU's asserted "spikeless"

3   claims at the TRO/PI hearing, ICU represented to the Court that there was "clearly" a "spikeless"

4   valve embodiment disclosed in Figures 13 and 20-22 of the Common Specification to the '509

5   Patent. A superficial review of these Figures shows that they did not contain or demonstrate any

6   "spikeless" embodiment, something Judge Stotler later discerned. Over two years later, ICU

7   eventually acknowledged that these figures do not, in fact, contain a "spikeless" embodiment,

8   and stated its original claim was an "honest mistake." Again, gross negligence may have caused

9   ICU's initial error in arguing that theses figures illustrated a "spikeless" embodiment, but bad

10   faith drove ICU's insistence on this argument as well as its failure to timely correct or explain its

11   error.

12        In total, ICU's request for the TRO/PI was objectively baseless and brought in bad faith.

13   When faced with facts, errors and omissions that would have deterred a prudent and objectively

14   reasonable counsel from pursuing the TRO/PI, ICU stayed the course and forced Alaris to

15   litigate a meritless action. ICU made multiple, repeated misrepresentations, whether knowingly

16   or recklessly, to the Court regarding its own patents in an effort to conceal what are now

17   characterized as errors in order to rescue the TRO/PI from denial. Ultimately, one of the most

18   telling facts is that all of the claims that ICU asserted in the TRO/PI proceeding were ultimately

19   withdrawn. These extraordinary tactics, standing alone, suffice to make this case exceptional.

20

21          *b)*    *ICU's Assertion of Its "Spike" Claims in the '866, '862 and '592 Patents*

22        ICU's next step in the litigation was also improper and served to exacerbate the case's

23   exceptional nature. Having been denied a TRO/PI on the basis of the "spikeless" claims of the

24   '509 Patent, ICU moved to amend its complaint in October 2004 to include claims describing a

25   medical valve with a "spike" element, termed "spike" claims. These "spike" claims were

26   contained in ICU's '862 and '866 "spike" Patents and in the '592 Patent, which contained both

27   "spike and "spikeless" claims. The Court granted ICU leave to amend the complaint in

28

1   December 2004.[5]

2       ICU had no objective basis for asserting these "spike" claims.  This conclusion is

3   compelled by three facts: 1) Alaris' SmartSite Valves contained no "spike" element, as

4   reasonably defined by the "spike" claims in ICU's Patents; 2) ICU only sued on these "spike"

5   claims by asserting a frivolous construction of the term "spike" as an "upward projection" in an

6   improper attempt to cover Alaris' SmartSite products; and 3) ICU's failure to sue on these

7   "spike" claims prior to June 2004, as well as its failure to assert them at the beginning of this

8   case, indicates that ICU did not believe a suit against the SmartSite Valves would be reasonable

9   using these "spike" claims.  ICU was entitled to bring in patent reinforcements in amending its

10  complaint after the TRO/PI Denial questioned the validity of the '509 Patent's "spikeless"

11  claims, but no objectively reasonable attorney would have thought that the "spike" claims were

12  suitable reinforcements.  Specifically, a reasonable attorney would not have construed the

13  "spike" element in ICU's patents as it did, nor would he or she have believed that every claim

14  limitation of the "spike" claims read on the accused Alaris products either literally or under the

15  doctrine of equivalents.  The Court has discussed at length in the claim construction order and its

16  partial summary judgment order of noninfringement on the "spike" claims why ICU's assertion

17  and construction of the "spike" claims was not objectively reasonable, even to one skilled in the

18  art.  In short, ICU's claimed construction of a "spike" as an "upright projection" lacked

19  dictionary or treatise support and omitted the pointed structure or piercing function that were

20  clearly required by the asserted patents' claims, specification and drawings.  No reasonable

21  attorney would have thus found that the SmartSite Valve possessed a "spike" element, as defined

22  by ICU's "spike" claims, either literally or under the doctrine of equivalents.  The "spike" claims

23  should never have been asserted at all, from an objective standpoint.

24       The unreasonableness of ICU's asserting the "spike" claims against the SmartSite is

25

26  ---

[5] ICU argues that because Judge Stotler granted ICU's request to amend the complaint to include the "spike" claims,
27  despite Alaris' having made the same arguments it now makes – that asserting the "spike" claims was frivolous and
    unjustified – ICU's litigation strategy was deemed legitimate.  This proves too much.  Judge Stotler was not
28  positioned to properly or fully adjudicate the merits of ICU's amended complaint, and ICU specifically argued
    against her doing so at that time.  Judge Stotler's decision to grant ICU leave to amend the complaint did not
    constitute a substantive endorsement of the merit of ICU's claims or a validation of its litigation strategy.

1    further borne out by the litigation history of this case. ICU admits that it did not originally sue

2    on its '862 and '866 "spike" Patents, which issued several years earlier in 1997 and 1999,

3    because of the "substantial difficulty" it would face in asserting the "spike" claims against

4    Alaris' products, which were "spikeless." Even though ICU stated that Alaris was a competitive

5    threat to its medical valve business as early as 2001, ICU clearly stated to the Court in the

6    TRO/PI proceedings that it needed to wait for the prosecution of the '509 Patent and its

7    "spike*less*" claims to combat the SmartSite Valve. All the while, ICU's "spike" claims in the

8    '866 and '862 Patents were not asserted. In June 2003, ICU further expanded this untapped

9    reserve of "spike" claims with the issuance of '592 Patent and its mix of "spike" and "spikeless"

10   claims. Still ICU did not sue on the "spike" claims, which by then were the subject of three

11   separate patents. This is likely because ICU's ultimate addition of the "spike" claims in

12   December 2004 from these three earlier patents, including one that contained the very same

13   "spikeless" claims that were asserted in the '509 Patent, fundamentally undermined its

14   representation in the TRO/PI hearing that it could not have sued earlier than it did. However,

15   once the TRO/PI Denial raised critical questions about the validity of the "spikeless" claims in

16   the '509 and '592 Patents, for both double-patenting and a probable lack of a sufficient written

17   description, ICU unreasonably turned to its "spike" claims to buttress, if not rescue, its case.

18          Furthermore, Alaris points to evidence showing that, prior to filing this case, ICU did not

19   believe that the SmartSite Valves infringed its "spike" claims. This evidence includes statements

20   by ICU's inventor and internal personnel separately indicating their views that the Alaris

21   SmartSite Valve had no "spike" element and that the SmartSite Valve was an appreciably

22   different device from any of ICU's valves. Alaris also cites a 1996 patent application for a

23   "spikeless" medical valve device that ICU filed after the SmartSite was commercially released;

24   Alaris argues the claimed device bore a striking resemblance to certain aspects of the SmartSite

25   Valve. Notably, the claimed device omitted any "spike" element and ICU described its design

26   with an internal short, stubby tube as "spikeless." This application did not claim priority to the

27   1991 and 1992 applications common to all of the patents asserted in this case, and it was later

28   abandoned. Though not dispositive on the issue of ICU's bad faith, this evidence weighs against

-14-

1   ICU's current contention that its assertion of the "spike" claims in late 2004 was supported by a

2   long-standing, widely-held or genuine belief that Alaris' SmartSite Valves always infringed

3   those claims. However, when viewed together with ICU's objectively baseless construction of a

4   "spike," its unreasonable argument that the SmartSite Valves infringed the "spike" claims, and

5   its need to hedge against the questioned validity of the asserted "spikeless" claims in this case,

6   ICU's assertion of the "spike" claims served only to improperly expand and prolong the

7   litigation in bad faith.

8

9          c)      *Alaris' Request for Rule 11 Sanctions in Response to ICU's Assertion of*

10                 *the "Spike" Claims in the Amended Complaint*

11         This case is also exceptional because ICU's assertion of the "spike" claims in the

12  amended complaint was objectively baseless and could not have been the product of a reasonable

13  pre-litigation inquiry, and, thus, it warrants Rule 11 sanctions. The Court discusses the reasons

14  for this conclusion later in this order, but notes here that an award of sanctions under Rule 11

15  provides a separate basis for finding a case exceptional. *Brooks*, 393 F.3d at 1381.

16

17         d)      *Exceptional Case Conclusions*

18         Alaris has presented clear and convincing evidence that ICU's TRO/PI request and its

19  assertion of the "spike" claims in this case were objectively baseless and made in bad faith. In

20  response, ICU argues that these actions did not rise to the level of attorney misconduct, and the

21  Court, in general, agrees. But, in the absence of misconduct, a court can find a case exceptional

22  where objectively baseless litigation was brought in subjective bad faith. *Brooks*, 393 F.3d at

23  1381. And a party's subjectively bad faith may be shown by objective circumstances

24  demonstrating that a party "knew" or "should have known" that its litigation tactics were

25  objectively baseless, rendering the "I didn't know" excuse invalid. *Eltech*, 903 F.2d at 810-11.

26  Alaris has met its burden in showing that this case is exceptional, and ICU's excuses are both

27

28

-15-

1   unavailing and insufficient.[6]

3       3.    Alaris is Entitled to a Portion of its Requested Attorney Fees

4       Having found the case exceptional, the Court finds that a partial award of attorney fees is

5   proper.  For the reasons discussed above, the Court finds that Alaris is entitled to fees for the

6   same parts of this litigation that rendered it exceptional.  These comprise the fees and costs

7   relating to: 1) the TRO/PI; 2) ICU's assertion of the "spike" claims; and 3) ICU's construction of

8   the term "spike" at claim construction.  Alaris is not entitled to fees for ICU's later litigation of

9   the "spikeless" claims of the '509 and '592 Patents after the "spike" claims were dismissed from

10   the case, nor is it entitled to fees for any other part of claim construction.  In contrast to its

11   objectively baseless and bad faith litigation of the TRO/PI and "spike" claims, ICU's later

12   unsuccessful litigation of the "spikeless" claims involved tactics best characterized as

13   overzealous or overly creative, as opposed to vexatious and frivolous.  As Alaris describes them,

14   these tactics include: 1) asserting, in violation of written description law, that the Common

15   Specification supports a "spikeless" embodiment in contradiction of the abstract, summary of the

16   invention, drawings and description of the operation of the valves described in the '509 and '592

17   Patents; 2) improperly relying on enablement law to extrapolate, and supplement the written

18   description with, unsupported embodiments without telling the Court that it was specifically

19   doing so; 3) repeating the false assertion that Figures 13 and 20-22 show a "spikeless"

20   embodiment; 4) ignoring Judge Stotler's "warning" in the TRO/PI findings that there was a

21   substantial question of the "spikeless" claims' validity for lack of written description at the onset

22   of this case; 5) improperly citing to an undated product reference, the "Q-Syte," as evidence of

23   infringement when, in fact, the reference was produced in 2003, nearly 11 years after the

---

[6] Alaris asserts several other grounds for declaring this case exceptional, which are not specifically addressed in this Order, but which may be encompassed in the improper TRO/PI and "spike" claims litigation.  Though not cited, these additional grounds or facts might well augment the Court's finding of an exceptional case, but the salient facts discussed above are sufficient for that task.  *See Beckman*, 892 F.2d at 1551 ("While it is necessary for the district court to articulate the particular factual findings on which the ultimate finding of 'exceptional circumstances' is based, when the court's finding[s] . . . [are] based on a 'strategy', we do not feel that it is necessary for the district court to set forth every underlying fact which contributed to its conclusion.").

1    application for the '509 and '592 Patents was filed; and 6) repeatedly contradicting the Court's

2    prior claim constructions in its expert analysis and legal arguments opposing Alaris' motion for

3    summary judgment of invalidity of the "spikeless" claims.

4           In the Court's view, the first two tactics at worst constitute ICU's making weak

5    arguments or citing to related, but inapposite law, as opposed to making frivolous or reckless

6    arguments, and Alaris does not muster clear and convincing evidence that ICU engaged in these

7    tactics in bad faith or for vexatious purposes.  To the extent that ICU may have reiterated that

8    Figures 13 and 20-22 demonstrated a "spikeless" embodiment in the later stages of this case, the

9    Court believes the attorney fees granted elsewhere by this Order already cover this tactic.  ICU's

10   decision to continue to assert its non-double-patented "spikeless" claims, despite Judge Stotler's

11   preliminary indication that there was a question as to their validity for lack of a written

12   description, does not warrant a conclusion of bad faith and an award of fees.  Alaris

13   acknowledges that Judge Stotler's findings in the TRO/PI Denial did not constitute a "finding on

14   the merits" that should have completely stopped ICU from litigating the matter further, even if

15   this Court later conclusively found that ICU's "spikeless" claims lacked a sufficient written

16   description on summary judgment.  ICU's reference to the Q-Syte was inaccurate and in error,

17   but it did not meaningfully influence the litigation, especially with respect to the invalidity of the

18   "spikeless" claims.

19          ICU's last faulted tactic of repeatedly contradicting this Court's claim constructions,

20   particularly the terms "spike" and "decompressed/compressed," deserves further analysis, but

21   does not warrant awarding fees.  As a preliminary matter, a party's disagreeing with a court order

22   is not presumed to be vexatious conduct sufficient to warrant fees under Section 285.  *Frank's*

23   *Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1379 (Fed. Cir.

24   2004).  ICU's counsel maintained that they "did no violence" to the Court's claim constructions

25   and, in fact, "embraced" them in their analysis.  However heartfelt ICU's belief in that repeated

26   claim may be, it is objectively not true, as the Court discussed at length in its order granting

27   Alaris' summary judgment motion that invalidated the "spikeless" claims in the '509 and '592

28   Patents.  The record shows that ICU openly disagreed with the Court's claim constructions and

-17-

1  did, in fact, repeatedly assert arguments that contradicted them in litigating subsequent matters,

2  especially in opposing Alaris' motion for summary judgment of invalidity of the "spikeless"

3  claims.  For example, ICU presented arguments and expert analysis that clearly contradicted the

4  Court's prior claim constructions, particularly those for "spike" and "decompressed," in a

5  manner that would have best been presented in a motion for reconsideration, which ICU never

6  brought.  After the Court's adverse claim constructions, ICU was free to move for

7  reconsideration, but, under *Markman*, it was not free to present arguments, evidence or analysis

8  that contradicted those constructions or the reasoning that supported them.[7]  However, when

9

10  [7] At the hearing on Alaris' Fees Motion, ICU presented a seminal argument for what it terms a "Constitutional
tension" that justified its reiteration of claim constructions previously rejected by the Court.  This "Constitutional

11  tension" arises when a party in a patent case receives an adverse claim construction and is them forced to either
concede the case or continue to argue a previously rejected claim construction by stating factual issues related to that

12  construction still exist in adjudicating jury-determined issues like written description or infringement.  ICU
advocated that while the text of court's claim construction is legally binding on the parties, the legal or factual

13  reasoning supporting that claim construction is not, especially when litigating related and factually-intensive issues
like invalidity or infringement.  A party would thus be free to present evidence and expert analysis that cited the text

14  of the court's claim construction, claiming to "embrace" it, but that provided context or other analysis by skilled
artisans that potentially undermines or conflicts with the reasoning supporting the constructions.  ICU admits it has

15  never briefed this issue or cited to any cases that note this "Constitutional tension" or support this novel theory.
          This Court rejected this theory in the Spikeless SJ Order as being in direct conflict with the Supreme Court

16  and Federal Circuit's mandate in *Markman*.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)
("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the

17  court.").  The Court recognizes the difficult situation ICU faced in light of the Court's unfavorable claim
construction, but reiterates its conclusion that ICU's proposed process would render a *Markman* hearing, like the

18  one that occurred in this case, meaningless.
          First, this is because claim construction involves a mixed question of law and fact, and ICU's theory

19  requires an unnatural, if not impossible parsing of the wording of a court's claim construction from the reasoning
and facts that generated it.  In construing a claim, the three – text, reasoning and facts – are inextricably linked, as a

20  court's claim constructions are fundamentally based on a close analysis of the specification and claims.  The only
reason for a party to present evidence that conflicted with one would be to confuse, undermine or obfuscate the

21  others.  Such evidence would disrupt the patent's "internal coherence," which the Supreme Court stated was best
ascertained by the "decisionmaker vested with the task of construing the patent," or, the court.  *Id.* at 389.

22          Second, ICU's proposed process would reintroduce the very uncertainty and inconsistency in jury-based
interpretations of patent claims that *Markman* strived to eliminate.  *See Markman*, 517 U.S. at 388-91 (holding

23  judges have greater skill than juries in correctly and uniformly interpreting patent claims).  For example, ICU sought
to characterize renewed expert analysis that equated a "spike" with a "tube" and maintained that "decompressed"

24  includes some compression or "preload," notwithstanding the Court's prior claim constructions to the contrary, as
issues fact in order to rescue its infringement claims under the doctrine of equivalents from the Court's narrow

25  constructions.  If the Court were to allow ICU to present this expert evidence, a jury would likely reach an
interpretation of the claims' meaning or scope that differed from the Court's claim constructions in evaluating a

26  larger factual issue, such as infringement or invalidity.  This, in effect, gives ICU two bites (or more) at the claim
construction apple and severely weakens the effect of the Court's claim constructions in the case, neither of which is

27  permitted under *Markman*.
          Finally, to the extent any "Constitutional tension" exists by virtue of a court's adjudication of a traditionally

28  jury-determined factual issue, the Supreme Court has already addressed and resolved it in favor of a court-based
claim construction in law that, logically, must be binding in both its wording and reasoning.  *See Markman*, 517 U.S.

1 | considered more broadly, this aspect of ICU's litigation of the "spikeless" claims, though,

2 | aggressive and unsuccessful, still does not warrant an award of fees.

3 | Thus, the "fair allocation of the burdens of litigation" in this case requires that Alaris be

4 | awarded fees under Section 285 relating to its defense against ICU's TRO/PI request and ICU's

5 | assertion of the "spike" claims. *Periccone*, 432 F.3d at 1380-81. While the Court is reluctant to

6 | penalize a party for vigorously litigating its claim constructions, ICU's specific construction of

7 | the term "spike" was frivolous, entitling Alaris to fees for having to litigate that term at claim

8 | construction as well. Otherwise, Alaris is not entitled to any other fees or costs relating to claim

9 | construction or ICU's litigation of the "spikeless" claims later in the case.

10

11 | **C.     Analysis Under Rule 11**

12 | The Court believes that Rule 11 sanctions are warranted for ICU's filing of the amended

13 | complaint, as its assertion of the "spike" claims was objectively baseless and could not have been

14 | the product of a competent and reasonable inquiry. For many of the reasons discussed above and

15 | in the Court's CC Order and Spikeless SJ Order, the assertion of the "spike" claims lacked legal

16 | and factual support such that no objectively reasonable attorney would believe that every ICU

17 | claim limitation read on the Alaris products either literally or under the doctrine of equivalents.

18 | *View Eng'g*, 208 F.3d at 986; *Antonious v. Spalding & Evenflo Companies, Inc.*, 275 F.3d 1066,

19

20

21 | at 376-91 (finding: 1) no evidence of common-law practice at the time of the framing that entailed application of the Seventh Amendment's jury guarantee to the construction of the claim document; 2) existing precedent was unclear on whether juries needed to decide claim constructions; and 3) the relative interpretive skills of judges and juries and statutory policies dictated that judges, and not juries, should construe claims as a matter of law). Interestingly, the Supreme Court rejected an argument similar to the one ICU advances, when one of the parties in *Markman* argued that a "jury should decide a question of meaning peculiar to a trade or profession simply because the question is a subject of testimony requiring credibility determinations, which are the jury's forte." *Markman*, 517 U.S. at 389. To the extent a court was now tasked with resolving factual issues traditionally reserved for a jury, including credibility, the Supreme Court's response was that "there is sufficient reason to treat construction of terms of art like many other responsibilities that we cede to a judge in the normal course of trial, notwithstanding its evidentiary underpinnings." *Id.* at 390. Otherwise, ICU's theory generally challenges this Court's adjudication of factual issues like invalidity or infringement on summary judgment. But courts are directed to do so under the law when no genuine issues of fact remain, even in patent cases where claim construction has precluded further adjudication of certain factual issues, especially the meaning of the asserted claims. (*See, e.g.*, Spikeless SJ Order at 16 (citing cases granting summary judgment on the factual issue of invalidity for lack of written description).) Thus, in light of *Markman* and numerous cases granting summary judgment on factual issues after an adverse claim construction, ICU's "Constitutional tension" argument appears without merit.

22

23

24

25

26

27

28

1    1072 (Fed. Cir. 2002).

2

3        1.    Background of Alaris' Rule 11 Motion and ICU's Pre-Litigation Investigation

4        Alaris filed its motion for sanctions under Rule 11 in September 2005 in response to

5    ICU's assertion of the "spike" claims in its amended complaint.  Alaris had sought ICU's Rule

6    11 basis for asserting the "spike" claims as early as September 2004, but ICU did not

7    satisfactorily reply and cited the attorney-client privilege.  During the meet-and-confer that

8    preceded Alaris' filing of the Rule 11 Motion, ICU presented its "dimensional analysis" and

9    construction of a "spike" that sought to justify the assertion of the "spike" claims.  This Court

10   ultimately rejected this same flawed "dimensional analysis" and improper construction of

11   "spike" in the CC Order that issued ten months later.  Therefore, it is unsurprising that Alaris

12   was unconvinced of the merit of ICU's early infringement analysis using the "spike" claims and

13   that Alaris later decided to pursue sanctions in earnest in September 2005.

14       The case did not see an early resolution of Alaris' Rule 11 Motion for several reasons.

15   Alaris argues that ICU initially avoided filing an opposition to the Rule 11 Motion because ICU

16   claimed it needed to investigate a "discovered conflict" between Alaris' counsel and ICU's prior

17   counsel at the Fulwider firm.  Despite several months of delay during this investigation, and

18   Alaris' having to file a motion to compel ICU to participate in discovery, which was granted,

19   ICU never moved to disqualify Alaris' counsel, prompting Alaris' current claims that this was

20   merely a dilatory tactic.  Given the complexity of the facts surrounding this alleged conflict, the

21   Court is not convinced of ICU's improper or purely dilatory motive in desiring to investigate it.

22   ICU did eventually file its opposition to Alaris' Rule 11 Motion in January 2006, but then the

23   case was transferred to this Court in February 2006.  This Court stayed Alaris' Rule 11 Motion

24   pending the outcome of *Markman* and summary judgment hearings.

25       In opposing Alaris' Rule 11 Motion in January 2006, ICU provided a declaration by its

26   litigation attorney, S. Christian Platt ("Platt"), which furnished some information regarding

27   ICU's investigation prior to asserting the "spike" claims.  (*See* Jan. 23, 2006 Decl. of S. Christian

28   Platt in Opposition to Alaris' Motion for Rule 11 Sanctions ("First Platt Decl.").)  ICU later

augmented the first declaration with a second one by Platt that was filed in opposition to Alaris'

Fees Motion, substantial parts of which were filed *in camera*. (*See* Mar. 19, 2007 Decl. of S.

Christian Platt in Support of ICU's Opposition to Alaris' Motion for Attorney Fees, *and* Mar. 19,

2007 Decl. of S. Christian Platt Authenticating and Attaching Certain Attorney-Client Privileged

And Attorney Work Product Protected Materials For In Camera Inspection Only in Opposition to

Alaris' Motion for Attorneys' Fees (collectively, the "Second Platt Decl.").) There were

numerous problems associated with ICU's submission of these two declarations, among others

recently submitted, in opposition to Alaris' Fees Motion.

First, the purpose for ICU's submission of the Second Platt Declaration is indecipherable.

ICU vacillates between three different purposes for this declaration and its contents. The cover

sheet of the Second Platt Declaration states it is in support of only ICU's Opposition to Alaris'

Fees Motion. However, in its Opposition brief to the Fees Motion, ICU states that the

declaration should be used to oppose both Alaris' Fees Motion and Alaris' Rule 11 Motion. (*See*

ICU Opp'n to Alaris' Fees Mot. at 5 n.6.) ICU then adds yet a third purpose in its brief, which is

to oppose Alaris' "challenging the Rule 11 basis of ICU's original filing and its preliminary

injunction application." (*Id.*)

To the extent that the Second Platt Declaration is meant to supplement the record for

Alaris' Rule 11 Motion, it is untimely, as the record for that motion closed in February 2006.

The Court indicated as much in March 2006 when it denied ICU's request for supplemental

briefing on the Rule 11 Motion and rejected a "sur-reply" brief and associated materials that ICU

filed to augment the Rule 11 record. Notwithstanding the Court's prior ruling, ICU now

resubmits, for the second time, the very same materials and "sur-reply" in the Second Platt

Declaration in a renewed attempt to expand the Rule 11 record while ostensibly claiming it was

for the purpose of opposing the Fees Motion. The Court, again, rejects ICU's untimely attempt

to supplement the Rule 11 record. The Second Platt Declaration and associated declarations that

ICU recently submitted to the Court in opposing Alaris' Fees Motion may not be used to oppose

Alaris' Rule 11 Motion.

Second, these declarations engage in a "selective" waiver of ICU's attorney-client

1    privilege, whether in opposing Alaris' Fees Motion or its Rule 11 Motion.  It is axiomatic that a

2    party cannot use the attorney-client privilege as a sword and a shield.  *Fort James Corp. v. Solo*

3    *Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005) ("The waiver extends beyond the document

4    initially produced out of concern for fairness, so that a party is prevented from disclosing

5    communications that support its position while simultaneously concealing communications that

6    do not." (citing *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir.

7    1981)).  Alaris asks the Court to disregard the materials in the First Platt Declaration because

8    ICU asserted the privilege and refused to allow Alaris discovery of ICU's pre-filing investigation

9    materials relating to its assertion of the "spike" claims, but then later submitted these materials,

10   thought not *in camera*, in opposing Alaris' Rule 11 Motion.  This precluded Alaris' meaningful

11   review and discovery of those and related materials.  The Court agrees that this was unfair, but

12   notes that ICU was not required to reveal privileged material to Alaris in opposing the Rule 11

13   Motion, and Alaris was able to engage in limited later discovery of some of the materials.

14          The Second Platt Declaration, however, is more problematic, particularly to the extent it

15   is intended to oppose Alaris' Fees Motion.  ICU submitted substantial parts of it for *in camera*

16   review at the conclusion of the case, thereby completely precluding Alaris' ability to review

17   those portions.  Other related declarations and depositions submitted by ICU in opposition to

18   Alaris' Fees Motion have sufficient redactions or objections, backed by ICU's assertion of

19   attorney-client privilege, such that Alaris could not reply by engaging in meaningful review or

20   discovery of the asserted, or related, materials.  For example, ICU has withheld the time sheets of

21   certain litigation and patent counsel as well as portions or versions of the written description

22   analysis supporting the asserted patents, despite alluding to their existence.  Elsewhere ICU cites

23   to documents that "memorialized" its pre-suit investigation, but these documents are dated after

24   the litigation began and ICU has refused to allow Alaris to discover the supporting materials for

25   those documents, including their actual creation dates.

26          The Court previously visited this issue in August 2006 and instructed ICU that it could

27   not assert the attorney-client privilege during fact discovery and then selectively waive the

28   privilege at the conclusion of the case in opposing a motion for attorney fees.  ICU's current

1    selective waiver of the privilege, made sufficiently late in the case to preclude any meaningful

2    review or discovery in response, ignores the Court's prior instructions and is plainly unfair to

3    Alaris. Even ICU admits the unfairness to Alaris posed by these delayed waivers, saying

4    "there's not much they can do." (*See* Mar. 27, 2007 Fees Mot. Hr'g Tr. 105:9.)  Further, these

5    late waivers are unjustified. For reasons still unknown to the Court, ICU believed it could wait

6    until the end of the case to file attorney-client privileged materials, *in camera*, in opposing

7    Alaris' Rule 11 Motion.  ICU had clear notice that Alaris would be challenging ICU's pre-

8    litigation diligence in a Rule 11 Motion at least as early as September 2005, when the Rule 11

9    Motion was filed.  At that time, Alaris made no secret that it would likely seek fees under

10   Section 285 for some of the same conduct challenged under its Rule 11 Motion.  At minimum,

11   ICU had sufficient opportunity to assert or waive the attorney-client privilege any time prior to

12   February 2006, when the Rule 11 Motion's record closed, or prior to February 2007, when the

13   case ended with the Court's grant of Alaris' second request for summary judgment.[8]  ICU's

14   assertion of the privilege now, at the end of the case, is both unfair and untimely.

15          Third, the First and Second Platt Declarations, even when considered in whole and when

16   combined with the other declarations ICU submitted in opposition to the Rule 11 and Fees

17   Motions, do not substantively justify or excuse ICU's litigation tactics or show its good faith.

18   These declarations were prepared by ICU's litigation counsel for the purpose of opposing the

19   Rule 11 and Fees Motions, and comprise mostly self-serving assertions of good faith by

20

21

22   [8] ICU cites to an unpublished district court case from the Southern District of New York, which, in turn, relied on
     the Advisory Committee Notes to Rule 11 to grant a party's request to submit attorney-client privileged documents

23   to the court for an *in camera* inspection without revealing them to the other side. *See Int'l Bus. Counselors, Inc. v.
     Bank of Ikeda, Ltd.*, No. 89 Civ. 8373 (CSH), 1991 WL 51173, at *1-*2 (S.D.N.Y. Apr. 3, 1991) ("The notes of the
     Advisory Committee specifically recognize that Rule 11 'does not require a party or an attorney to disclose

24   privileged communications or work product in order to show that the signing of the pleading, motion or other paper
     is substantially justified.' The Committee identifies *in camera* inspection by the Court as an appropriate manner of

25   dealing with the issue."). Here, ICU asserts privilege for documents used to oppose an attorney fees motion made
     under Section 285, thereby precluding Alaris' meaningful review and discovery of, and response to, those

26   documents. Even if some of those privileged documents encompass evidence or communications also addressed by
     Alaris' Rule 11 Motion, the Rule 11 record closed in February 2006. Otherwise, the court warned ICU that it could

27   not assert privilege during the discovery phase of the case and then selectively waive it at the conclusion of the case
     in an attempt to oppose Alaris' impending motion for attorney fees under Section 285. Thus, were ICU's timely

28   assertion of privilege for a Rule 11 motion the real issue, the Advisory Committee Notes would be of more
     assistance to the Court.

1  interested witnesses, such as ICU's CEO (Dr. George Lopez), trial counsel (Fulwider, Patton,

2  Lee & Utecht; Paul Hastings; or Pooley & Oliver), patent counsel (Knobbe Martens) and its paid

3  experts (Dr. Maureen Reitman and Bob Rogers).  These materials lack the indicia of credibility

4  provided by declarations or opinions from outside, independent counsel or experts, particularly

5  outside patent, as opposed to litigation, counsel.  Most of the materials appear to have been

6  "memorialized" in retrospect, providing marginal support compared to, for example, an *ex ante*

7  documented and vetted analysis that preceded the litigation or that, at minimum, preceded the

8  TRO/PI request and the inclusion of the "spike" claims in the amended complaint.

9          The most helpful evidence cited by these materials suffers from reliability problems.  For

10  example, ICU cites to a December 1997 meeting, attended by both a Fulwider and Knobbe

11  attorney, where ICU's CEO claims its counsel from Fulwider opined that the Alaris SmartSite

12  Valve infringed the '866 Patent and that ICU should assert its patents against smaller companies

13  first.  The veracity of this evidence is complicated by the fact that ICU terminated its relationship

14  with the Fulwider firm in 1999 and later sued the firm in 2004 for alleged conflicts in improperly

15  advising Alaris' predecessor and in working with Alaris' counsel in this case, from the firm of

16  McAndrews, Held & Malloy, on arguably related matters.  However, in the subsequent

17  malpractice case between ICU and the Fulwider firm, the Fulwider attorney cited for giving the

18  informal 1997 infringement opinion later stated it came from the Knobbe attorney instead, as the

19  Fulwider attorney claimed he was unfamiliar with the particular technology area of the '866

20  Patent.  Concurrently, Alaris points to separate statements by ICU's CEO that indicate that he

21  did not rely on the Knobbe firm's infringement opinions concerning the '866 Patent.  The import

22  of this alleged infringement opinion is further lessened by the fact that ICU omitted the '866

23  Patent from the original complaint and only sued on the '866 Patent in 2004 after the validity of

24  the '509 Patent was critically questioned.  ICU also appears to have disregarded the advice to sue

25  smaller companies first, as it sued Alaris in 2004 only after it announced that it was being

26  acquired by the much larger company, Cardinal Health.  In total, the Fulwider firm's advice

27  remains unclear and appears to have had little bearing on ICU's actions after 1999, or on its

28  specific litigation strategy to pursue the TRO/PI or to assert the "spike" claims in an actual suit

1   prior to 2004. Therefore, ICU's citation to the documents and analysis in the Platt declarations is

2   largely unavailing in opposing both Alaris' Rule 11 and Fees Motions.

3

4          2.     Rule 11 Sanctions are Warranted for ICU's Assertion of the "Spike" Claims in the

5                 Amended Complaint

6         Alaris bases its Rule 11 sanctions request on a combination of ICU's assertion of a

7   frivolous legal position (i.e., ICU's proposed construction of a "spike" as an "upward projection"

8   is frivolous), in violation of Rule 11(b)(2), and ICU's failure to make an adequate factual

9   investigation before filing the amended complaint, in violation of Rule 11(b)(3). The Federal

10   Circuit has construed Rule 11, in the context of patent infringement actions, "to require that an

11   attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging

12   patent infringement." *Antonius*, 275 F.3d at 1072 (citing *View Eng'g*, 208 F.3d at 986). An

13   attorney must not rely solely on the client's claim interpretation and must perform an

14   independent analysis to assert a nonfrivolous claim construction. *Id.*

15         Looking at the materials referenced in the First Platt Declaration, submitted in opposition

16   to the Rule 11 Motion in January 2006, it appears that ICU's counsel did analyze and construe

17   the "spike" claims prior to asserting them in this case. There is nothing in these materials that

18   suggests ICU's counsel improperly relied on the inventor for its claim analysis. Thus, ICU may

19   be sanctioned for violating Rule 11(b)(2) only if a reasonable attorney would have concluded

20   that the claim construction proposed by the ICU attorneys was frivolous. As the Court stated in

21   its claim construction order and its summary judgments orders for both the "spike" and

22   "spikeless" claims, ICU's construction of a "spike" as being merely an "upward projection" with

23   no pointed tip or piercing function was frivolous. ICU's construction plainly defied the asserted

24   patents' claims, specification and drawings and found no extrinsic support in applicable

25   dictionaries or treatises. The materials in the Platt Declarations, including its references to ICU's

26   expert's morphed device drawings and flawed "dimensional analysis," do not rescue this claim

27   construction from being factually unsupportable or legally unreasonable, but simply memorialize

28   what was always a wholly unreasonable construction of the term "spike."

1        Second, under a proper construction of the claims, an objectively reasonable attorney

2  could not conclude that the SmartSite Valves infringed the asserted "spike" claims, or that every

3  "spike" claim limitation read on the SmartSite Valve, either literally or under the doctrine of

4  equivalents. *View Eng'g*, 208 F.3d at 986.  In evaluating the question of infringement, ICU's

5  counsel did disassemble the SmartSite Valve, analyze and evaluate its structure with expert

6  analysis and document its findings.  Perhaps this denotes a zealous pre-filing investigation, but

7  not a reasonable one.  At its most basic level, ICU's counsel did not reasonably construe the

8  meaning of the "spike" element and did not reasonably compare SmartSite Valve, which

9  possesses no "spike" element, with the patented ICU devices that do, thus making infringement

10  impossible.  ICU points to no pre-litigation evidence supporting its allegations of infringement

11  that are not somehow based on an unreasonable construction of the "spike" element and a

12  defective comparison of the "spike" claims to the SmartSite Valves.

13        Even if some aspects of the ICU "spike" claims did read on the SmartSite Valves,

14  rendering valid certain parts of the amended complaint, the key allegation that the SmartSite

15  Valves possessed a "spike" element was objectively unreasonable.  A reasonable review of the

16  "spike" claims would have dissuaded ICU from asserting them in the amended complaint.  This

17  critical fault in one aspect of the amended complaint tainted it in its entirety for the purpose of

18  awarding sanctions.  The current version of Rule 11 makes clear that sanctions may be based on

19  a single invalid legal or factual theory, even if other asserted theories are valid.  *See* Fed. R. Civ.

20  P. 11(c)(1)(A) (noting that a party may be sanctioned if any "challenged paper, claim, defense,

21  contention, allegation, or denial is not withdrawn or appropriately corrected").  This is because

22  "[a]dvancing even a single invalid theory forces the defendant to respond and to do work it

23  should not have been required to do." *Antonius*, 275 F.3d at 1075.

24        Thus, Alaris is entitled to sanctions under Rule 11 for ICU's assertion of the "spike"

25  claims in the amended complaint.  However, the monetary value of these sanctions is subsumed

26  by the attorney fees the Court has awarded under Section 285 elsewhere in this Order for Alaris'

27  having to litigate the same "spike" claims.

28

**D.   Analysis Under Other Statutes or Doctrines**

The Court believes sanctions under other statutes or doctrines, though possible, are unnecessary or duplicative.  Specifically, sanctions would be duplicative under Section 1927, which merely targets specific attorneys for the same reckless or bad faith conduct that justifies sanctions under Section 285 and Rule 11 elsewhere in this order.  Sanctions are not necessary under the Court's inherent power, because all of ICU's inappropriate conduct can be addressed by sanctions under Section 285 and Rule 11.  *See Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under [a statute or] the Rules, the court ordinarily should rely on the [statute or] Rules rather than the inherent power.").

## III.

## CONCLUSION

For the foregoing reasons, the Court finds that this case is exceptional and that Alaris is entitled to a portion of its requested attorney fees under 35 U.S.C. § 285.  Alaris' Motion for Fees, Costs and Expenses under 35 U.S.C. § 285 is thus GRANTED IN PART.  Alaris' Motion for Sanctions under Fed. R. Civ. P. 11 is GRANTED, but these sanctions are subsumed by the attorney fees awarded by this Order under Section 285.  Alaris is directed to recalculate and resubmit its claim for the portion of its fees and costs, as provided and allocated by this Order, within seven (7) days from the date of this Order.  ICU will then have ten (10) days to file any opposition, and Alaris will be then be granted an additional five (5) days for a reply.  The Court will contact the parties to schedule a hearing regarding the attorney fee amounts.

IT IS SO ORDERED.

DATED: *April 16, 2007*                *Mariana R. Pfaelzer*
Hon. Mariana R. Pfaelzer
United States District Judge

-27-